MAYOR AND CITY COUNCIL OF BALTIMORE,
A MUNICIPAL CORPORATION,

*vs.*

WALTER SCOTT, FIRESTONE TIRE AND RUBBER
COMPANY, LITTLE GIANT SALES COMPANY
AND MARMON & COLE SALES COMPANY,
BODIES CORPORATE.

*Building permits: mandamus; unauthorized and wrongful use
of building when erected; garage and public auto-
mobile service station; injunction.*

Where, under mandamus proceedings, a permit was issued
by the Building Inspector of Baltimore for the erection of a
building for general business purposes and for the exposing and
sale of automobiles and accessories, the petitioner can not, after
the building is erected, use it for another purpose—a garage
and public service station, for which a permit had been pre-
viously refused, and for which a permit can be given only with
the approval of the Mayor first had and obtained.        p. 231

*Decided June 28th, 1917.*

Appeal from Circuit Court No. 2 of Baltimore City.
(DUFFY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Alexander Preston, Deputy City Solicitor* (with whom was *S. S. Field, City Solicitor,* on the brief), for the appellant.

*Randolph Barton* (with whom was *James J. McGrath* on the brief), for the appellees.

CONSTABLE, J., delivered the opinion of the Court.

This case is a sequel to that of *Stubbs* v. *Scott,* reported in 127 Md. 86, wherein the appellant in that case, as Inspector of Buildings of Baltimore City was directed, by the writ of mandamus, to issue to the appellee a permit to erect a building as prayed for.

The present appeal is from an order dismissing the bill of complaint of the appellant in the present case, praying for an injunction to restrain the appellees from using the building, erected under the aforesaid permit, in the manner they are now doing.

It appears from the record that Walter Scott, one of the appellees, on the 18th day of June, 1915, filed his petition in the Superior Court of Baltimore City, praying that the writ of mandamus be directed to the Building Inspector of Baltimore City, requiring him to issue to the petitioner a permit for a building, to which we will refer more in detail later. The petitioner recited therein that "in or about the month of February, 1915, desiring to erect and conduct a salesroom and service station for the sale of automobiles, and for the other purposes incident to the business of such establishments," he applied to the defendant for a permit to erect a building suitable for that business, on the lot of ground situated on the east side of St. Paul street, between Mt. Royal avenue on the north, and Preston street on the south, having a frontage on said street of one hundred and ten feet

and a depth of one hundred and twenty-two feet and six inches back to an alley running parallel with said St. Paul street and of a width of twenty feet. It was then recited that the said permit was not granted, and that "subsequently, your petitioner, being still anxious to secure a location on said lot for the sale of automobiles, abandoned the idea of establishing a service station at the place named, and purchased said lot of ground from the owners of the same and now owns said property," and that he again made application to the defendant "for a permit to erect on said lot four stores for general business purposes, in accordance with the provisions of the plat and specifications herewith filed. * * * That your petitioner proposes to use one of said stores for the purpose of exposing for sale, and for selling automobiles. That the other stores he proposes to rent, or if it proves to be expedient so to do to sell them when they will be used for such purposes as stores so located may be profitably used." This application was also refused.

The Court, after hearing the testimony, in which the petitioner fully explained the purposes for which he intended to use the building under his first application as well as under his second application, directed the writ of mandamus to issue. This Court on appeal affirmed that decree.

CHIEF JUDGE BOYD, in delivering the opinion of the Court, on that appeal, said: "He (Stubbs) admitted that he was influenced by the facts that the plan of the building was susceptible of being used as a garage, and that the second applicant was the same person as the first applicant. He also admitted that he discredited Mr. Scott's good faith and his statement that he wanted it now for stores. * * * As we have seen, the petitioner in this case asked for a mandamus to compel the respondent to issue a permit 'to erect on said lot four stores for general business purposes, in accordance with the provisions of the plat and specifications herewith filed.' The order of the lower Court directed 'that the writ of mandamus be forthwith issued in manner and form as prayed in said petition,' and we can not admit, as we understood it to

be suggested at the argument by counsel for appellant, that the petitioner can obtain a permit, through the aid of the Court, to erect a building for purposes set out in his petition, and then after he has erected the building make use of it for purposes such as he is not entitled to use it for without first obtaining the approval of the Mayor, particularly for such purposes as his petition shows he first asked a permit for, which was refused.   That would be a fraud on the Court which granted him the relief prayed for, and any attempt to perpetuate it could and should promptly be checked.   We are not now called upon to pass on the validity of the ordinance, in so far as the particular provisions applicable to garages, etc., and numbered 5, are concerned, inasmuch as if the petitioner desired to attack the ordinance he could have done so, but, practically conceding it to be valid, abandoned further effort to get that permit and now seeks one for another avowed purpose.   Hence we say he would not be permitted to erect a building, under a permit obtained by the help of the Court, for the purpose stated in the petition, and then use it for other purposes which were denied him. We do not mean to say he can not use a store to exhibit automobiles for sale, as he says his intention is, but he can not under the permit to be granted under this petition use it as a garage or service station, such as he first applied for."

All that remains for us to determine, upon this appeal, is whether or not there has been such a use of the building as to evidence a total disregard of the reasons expressed by this Court, as to why the permit should be granted.   And for this purpose, no better method can be employed than to examine the testimony of Scott, given during the trial of the petition for the mandamus, in reference as to what purpose he had intended to put the building to when he first applied for the permit, and what he said his intention was on his application for the second permit, and to contrast that testimony with that in the present appeal.

"Q.  Did you ever apply to the authorities in Baltimore for a permit to erect and conduct a salesroom and service station

for the sale of automobiles on St. Paul street? A. Yes, sir.
Q. When was that? A. That was early in the spring, or
late winter. Q. What did you contemplate having there at
that time? A. A service department. Q. What is a service
station? A. It is a service department. It is a place where
you take care of cars you sell and keep them in running
order, if anything gets out of order and needs attention, it
is the place where you give it to them; they get attention
there. Q. You have workmen for the purpose of repairing?
A. Yes, sir. Q. Some blacksmithing is done? A. No. Q.
Is not that an incident to repairs that take place? A. It
could but we don't run it that way; most of the parts we get
from the factory. Q. You do have hammering and noises of
that kind incident to making repairs? A. Yes, sir. Q. This
peculiarity of a service station is different from some other
kind of station, is it not? A. I don't exactly get that. Q.
A service station is where you repair automobiles? A. Yes;
give them whatever attention is required. Q. As they come
in, do you take them on storage? A. No, sir. Q. That is
not an incident of a service station? A. We do not, but
probably some other places do. Q. Is not that one of the
incidents of a service station also taking them on storage?
A. That is optional with the man, of course, some do."

He then testified from the plans and specifications, filed as
exhibits, that the building to be erected would be a two-story
one, containing four stores on the lower floor, each with a
frontage of twenty-seven and a half feet, and a depth of one
hundred and twenty-two and a half feet; that the part of the
building he intended to occupy was the front portion of the
second store from the south end of the building, the dimen-
sions of which were twenty-seven and a half feet at the front
to a depth of forty feet.

"Q. You are going to use the first forty feet as a store
room, that is an exhibition room? A. Yes, sir. Q. What
are you going to use the balance in the rear for? A. In the
rear, I am going to rent that for anything that I can use it
for, anything at all, it is for rent. Q. You are going to keep

automobiles there for sale? A. Yes, that is the idea. Q. As a matter of fact, that in reality is the kind of business you wish to conduct, the kind that the Zell and the Mardel people conduct? A. Not exactly, no, sir; I wish to conduct what I now conduct, sales agency, and to take care of my own customers, my business has grown and I am not in a proper neighborhood for the business I want to get, I want to get in an automobile district; I want to show my goods where the other large dealers in Baltimore show theirs; that is why I want to get down there; that is the main reason; a service station can be added afterwards; it makes no difference about a service station but I want to have the sales store there, I want to get there so that when people go from Zell's, they will walk into my place, or from the Mardel place, which is only a square or less than a square further. Q. Your original plans, the ones which were not granted, call for a service station? A. Yes. Q. What do you mean by service station? A. I mean a place to take care of cars I sell, and keep them in running order. Q. Keep them in repair, is that right? A. Yes, sir. Q. Back of that salesroom, will there be one or more rooms? A. Back of the salesroom, on account of not getting the permit that I wanted, I would rent for some purpose, I would rent out, I would have to rent that out; what I am desirous of getting is a salesroom; in the rear of that, I can not have a service station, and I will rent it out for any purpose I can rent it out for; I would fix that up to suit some tenant I will have to get; that room will not be any good to me there."

Could testimony have been made stronger than this to convince the Court that Scott had absolutely given up all idea of having a service station upon the premises, and that he had fully made up his mind to confine his efforts to a salesroom alone without thought of doing repair work of any kind? It is not necessary to quibble over the technical meaning of the expressions, "public or private service stations," or "public or private garages," for we have in plain language, from Scott, just exactly the character of service station he sought

in his first application, and in emphatic language that he had abandoned the idea for such a station. It is no wonder then, that this Court, with the opinion that Scott had a legal right to erect stores upon his lot, together with Scott's disclaimer, of any idea of using the stores for any other purpose, brushed aside the argument of the counsel for the city, based upon no proof, that the second application was a mere subterfuge to gain what he had lost on the first application.

Now, let us inquire what was done by Scott after the building was erected, and what was being done by him and his tenants at the time of the filing of this bill. The building was erected according to the plans, and was divided into four stores, on the lower floor, of equal widths and equal depths. The two adjoining stores to the north were leased, for a period of years, to the Firestone Tire & Rubber Company, for the purposes, as expressed in the lease, of carrying on "the operation of its business as a salesroom and other purposes pertaining to said business, such as storing of stock, repairing and service purposes." The lease contained the condition that it would "abide by and perform all of the requirements of law, or city ordinance touching the said premises, and any business to be carried on, or about the same." The store at the south end of the building was leased for a term of years. And the lessee covenanted, that it would not "cause, or suffer any noisy, offensive or improper use of said premises to be made, or use any part thereof for any purpose more injurious than that of a salesroom for automobiles, automobile supplies and accessories; nor do anything, nor to permit anything to be done, which in any way would conflict with the laws, rules or ordinances of the City of Baltimore." The remaining store is occupied in its entirety by Scott. After the filing of the bill, the Little Giant Sales Company is alleged to have sold out its interest to the Reo Maryland Company, which company is now occupying those premises, though the president seems to be the same person. Scott has the agency for, and sells the Marmon Pleasure Car and the Reo Maryland Co. has the agency for, and sells

the Reo truck. So the building is occupied by three concerns, engaged in the sale of automobiles, or their accessories. Under our previous decision, there could be no objection to this, but it is contended, and, in our opinion, proved by the overwhelming weight of the testimony, that they are doing more than this. In fact, so far as the testimony of Scott is concerned, it is admitted that he is doing more, but it is claimed by him that what he is doing is that which is necessary for the prosecution of his business of selling automobiles. What we refer to is that all of these concerns are conducting service stations. According to the proof, and the admissions, the Reo Maryland Company and Scott are both repairing automobiles upon the premises in large numbers. Scott, in admitting this, testifies that in making repairs, he confines himself exclusively to the cars which he sells and to the cars of different makes which he takes in exchange, or part payment, of those he sells. He testified that he employed four workmen on the premises, but that no work was done on any of these cars, but that character of work which could be done by physical labor without the aid of machinery, such as was produced by power. The proof shows that the Reo Company does its work in the same way, with the difference that it does not confine itself to its own make of trucks, and those taken in exchange, but takes in generally any car, and has a sign over its place of business Reo Emergency Station.

Without going into detail of the testimony, we are of the opinion that Scott has flagrantly violated the spirit which caused a permit to erect stores to be extended to him, as a short extract from his testimony in this case will show:

"Q. I am not asking you what you wanted to do. We all knew that and stopped you from doing it. I am asking you now what you did do, you got a permit to put a building there with stores in it, did you not? A. Yes, sir. Q. And then you added a service station on your own account, did you not? A. On my own account? Q. Yes? A. What do you mean by my own account? Q. You did not have a permit for a service station? A. No, I did not have a permit

for a service station, I had a permit to put a building up there, and I took it from that, to sell automobiles, that was an incident to the sale, a necessity to the sale, and as long as I conducted the place as a private place, and not as a public place, there would not be any objection."

We need only refer to his testimony given in the mandamus case, and quoted above by us, to show concluisvely that this is exactly what he had applied for in his first application for a permit, and which had been abandoned by him upon the refusal of that permit. And that is the very thing which this Court said, in its opinion, should promptly be checked if he attempted to do. We do not think it was possible for him to have misunderstood this language: "We do not mean to say he can not use a store to exhibit automobiles for sale, as he says his intention is, but he can not, under the permit to be granted under this petition, use it as a garage or service station, such as he first applied for." He had told the Court, in the plainest kind of language, what his idea of a service station was, and that he was not asking for a permit for that. Upon such assurance, his permit was granted for an exhibition room for automobiles. And yet, now, he admits that he is doing the very self same thing that this Court had said he should not do.

The Firestone Tire & Rubber Company, as its name implies, is a concern dealing in automobile tires. As we have pointed out above Scott leased two of the stores to it for the purposes of a salesroom and other purposes pertaining to said business, such as storing or stock, repairing and service purposes.

On the day the company moved into its new quarters, there appeared in the daily press of Baltimore, a write-up inspired by the manager of the company of its new quarters, and what the automobile public could expect of it. The article is too long to reproduce in this opinion, and we will content ourselves with a few extracts as illustrating the trend of the whole article. "On the first floor will be a garage occupying 3,000 square feet. This will be used for motor

trucks, which can drive in from the alley in the rear.  The hydraulic press of 200 tons' capacity is in this garage and the owner of a truck may take his truck to this garage and have tires pressed on his wheels in the quickest time with experts.  This garage is equipped to take care of all the needs of a wheel of a truck."  Again, "The manager of the local Firestone branch, states that the new branch here is one of the most complete in the entire country and that everything has been done towards rendering the best possible service to users of Firestone tires, whether pneumatic or solids for trucks.  Special equipment has been installed to take care of truck tire users and the owners of trucks will find, says Mr. Leisure, that Firestone service here will be unparalleled in any part of the entire country."  And again, "practically 24-hour-a-day service will be rendered truck users at the new Firestone branch. * * * He will be told that he can bring his trucks into the Firestone Garage late at night and workmen will be kept there to press on the tires when the trucks arrive."

"*Service to Truck Owners*—This new, fully equipped branch brings factory efficiency to you.  Workmen with all the ability of home-plant experts are here with complete shop equipment.  Depend on us to keep your trucks moving.  Command the facilities of this service station when your truck needs attention.  It was installed to serve you."

The proof shows conclusively that they were doing all that their advertisement claimed that they would do.  They had installed the large hydraulic press, which from the proof seems to have been in almost constant use night and day, disturbing a number of the neighbors by the noises produced by it.  Trucks were coming and going and blocking up the alley in the rear constantly.

In our opinion they can not and should not be permitted to use these stores in the manner they have been doing since the first day of their occupancy.  The service which they are giving to the automobile public, with the exception of the

actual sale of tires, is absolutely contrary to the conditions under which the building permit was granted to Scott.

As stated above, the Little Giant Sales Company alleged in its answer, that it sold out its interest in the lease to the Reo Maryland Company. The bill was not amended so as to make the Reo Maryland Company a party defendant, and therefore, there is no prayer against it for relief, but the prayer asks for relief only against the original defendants "and each of them, their agents and servants," so, notwithstanding, we think that in a proper proceeding the Reo Company should be enjoined, nevertheless, in this proceeding we are not directing in remanding the case, that the injunction shall issue against it. But if there is any disposition shown on its part to ignore this opinion the appellant should have no difficulty in securing immediate relief for its infractions.

The Marmon and Cole Sales Company, one of the defendants, is not shown to have had any connection whatever with the building, or any of the business therein conducted, and took no part in these proceedings, by answer or otherwise.

For the above reasons we will reverse the order appealed from, and remand the cause in order that an injunction may issue as prayed against all the defendants, with the exception of the Marmon and Cole Sales Company.

> *Decree reversed and cause remanded, the appellees to pay the costs.*